UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Morya L. Smith,

       Plaintiff,

      v.                                   Civil Action No. 2:16–cv–51

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## OPINION AND ORDER
(Docs. 6, 7)

Plaintiff Morya Smith brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court are Smith's motion to reverse the Commissioner's decision (Doc. 6), and the Commissioner's motion to affirm the same (Doc. 7).  For the reasons stated below, Smith's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

Smith was 33 years old on her alleged disability onset date of June 30, 2010. (AR 59, 293.)  She graduated from high school in 1994, and completed cosmetology school in 2006.  (AR 37, 59, 294.)  She has worked as a sales clerk at Home Depot and an office worker at a nursing home.  (AR 36, 60.)  Additionally, she worked as a hairstylist

from approximately January 2006 through June 2010, and was working ten hours per week

as a hairstylist at JC Penney in February 2012.  (AR 60, 294.)  During the alleged disability

period, Smith lived in an apartment with her adolescent daughter for a period, and in a

house with her boyfriend and each of their adolescent daughters at other times.  (*See*

AR 313, 333, 353, 651–52.)

      At the February 2012 administrative hearing, Smith testified that she is unable to

work because she sleeps a lot, gets angry "pretty easily," has anxiety, is "very irritable,"

and "ha[s] a hard time with authority."  (AR 61.)  She stated that there are days when "I

feel like I'm going to explode and burst out of my skin."  (*Id.*)  She also testified that she

gets irritable, nervous, and confused in stressful situations.  (AR 64.)  For example, if her

supervisor at work tells her to do something different or disciplines her, she "get[s] angry

and . . . leave[s]."  (*Id.*)  She also has arguments with her coworkers because they make her

angry.  (AR 65.)  Smith further stated that, on a typical day, she sleeps; except on

Tuesdays and Thursdays, she picks up her daughter from school, sometimes eats with her

daughter, and watches television.  (AR 61–62.)  At the more recent May 2014

administrative hearing, Smith testified that she works one day a week for between three

and five hours (AR 33), but she was about to begin a one-month medical leave due to a

new medication making her "extremely tired" (AR 34).

      Smith's Function Reports from November 2010 and February 2011 indicate that,

during that period, she went to the gym on an almost daily basis; cared for her adolescent

daughter when she was not in school; cooked meals; did chores around the house; and

slept.  (AR 313–15, 317, 333–35, 353–60.)  She had no hobbies other than going to the gym, and her sister shopped for her and managed her bills.  (AR 62, 316–17, 336–37, 353–60.)  The Reports indicate that Smith's father and other family members committed suicide; and that she has mood swings, anger problems, and difficulty getting along with others, especially authority figures.  (AR 318–20, 338–40, 353–60.)

In July 2010, Smith filed applications for SSI and DIB, alleging that she stopped working on June 30, 2010 due to bipolar disorder.  (AR 293.)  In an updated disability form filed in January 2011, Smith added that she also has borderline personality disorder and alcohol abuse.  (AR 346.)  Smith's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on February 13, 2012 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 56–77.)  Smith appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  On March 12, 2012, the ALJ issued a decision finding that Smith was not disabled under the Social Security Act at any time from her alleged disability onset date through the date of the decision.  (AR 130–39.)  About a year later, on June 12, 2013, the Appeals Council remanded the case to the ALJ for resolution of several specific issues.  (AR 145–47.)  Pursuant to the remand order, ALJ Merrill conducted a second administrative hearing on May 19, 2014.  (AR 30–54.)  On July 21, 2014, the ALJ issued a new decision, again finding that Smith was not disabled.  (12–24.)  Thereafter, the Appeals Council denied Smith's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted her

administrative remedies, Smith filed the Complaint in this action on February 24, 2016. (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of

proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that, although Smith had worked after her alleged disability onset date of June 30, 2010, her earnings were below substantial gainful activity limits, and thus she had not engaged in substantial gainful activity since her alleged onset date. (AR 14.) At step two, the ALJ found that Smith had the severe impairments of bipolar affective disorder and alcohol abuse. (AR 15.) The ALJ noted that Smith's alcohol abuse was in remission, but found that the condition was "not material" because Smith was "not disabled even when she was using [alcohol]." (*Id.*) At step three, the ALJ found that none of Smith's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 15–16.)

Next, the ALJ determined that Smith had the RFC to perform "a full range of work at all exertional levels," but with the following nonexertional limitations:

> [Smith] is limited to one[-] to three[-]step tasks and is capable of routine interaction with the general public, supervisors[,] and co[]workers, and she is able to manage routine changes in work tasks. She is able to sustain concentration, persistence[,] and pace for two-hour periods over an eight-hour workday through a typical workweek.

(AR 17.) Given this RFC, and based on testimony from the VE, the ALJ found that Smith was capable of performing her past relevant work as a sales clerk and an office worker, both as described and as generally performed in the economy. (AR 22–23.) Alternatively,

and again based on testimony from the VE, the ALJ determined that Smith could perform

other jobs existing in significant numbers in the national economy, including the

representative occupations of cleaner and price marker.  (AR 23–24.)  The ALJ concluded

that Smith had not been under a disability from her alleged disability onset date of June 30,

2010 through July 21, 2014, the date of the ALJ's second decision.  (AR 24.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A

person will be found disabled only if it is determined that his "impairments are of such

severity that he is not only unable to do his previous work[,] but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial evidence"

exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923

F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)

("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Smith makes three principal arguments in support of remand: (1) the ALJ erred in his analysis of the medical opinions; (2) the ALJ should have accounted for Smith's limited ability to handle stressful situations in his RFC determination; and (3) the ALJ failed to ask the VE if her testimony was consistent with the U.S. Department of Labor's Dictionary of Occupational Titles (DOT). (Doc. 6.) In response, the Commissioner asserts that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 7.) As explained below, the Court finds in favor of the Commissioner.

## I.    Analysis of Medical Opinions

Smith argues that the ALJ failed to properly weigh the medical opinions. She claims the ALJ should have afforded more weight to the opinions of treating psychiatrist Jennifer FauntLeRoy, M.D., and less weight to the opinions of nonexamining agency consultants Edward Schwartzreich, M.D., and Joseph Patalano, Ph.D. Smith focuses on four of Dr. FauntLeRoy's opinions regarding Smith's ability to work.

7

The first opinion was made by Dr. FauntLeRoy in a letter dated January 17, 2011 to "Binder & Binder." (AR 595, 614.)[1] Therein, Dr. FauntLeRoy stated that Smith had been a patient in her practice since November 2005, carrying the diagnoses of bipolar affective disorder, alcohol abuse, borderline personality disorder, and possible posttraumatic stress disorder. (*Id.*) Dr. FauntLeRoy noted that Smith's disabilities from these conditions included "significant stress sensitivity and inability to 'juggle' multiple stressors,"[2] resulting in "a series of unsuccessful attempts to work as a hairdresser." (*Id.*) The Doctor further stated that, under extreme stress, Smith "rapidly decompensates to a level approaching delusional paranoia." (*Id.*) Dr. FauntLeRoy opined that "the best [work] situation" for Smith would be "very part time, at least until her daughter is grown." (*Id.*) The Doctor further opined that it would take more than one year to treat Smith's mental illnesses, and that "only gradual improvement" was expected. (*Id.*)[3]

About four months later, in May 2011, Dr. FauntLeRoy completed a Treating Source Statement regarding Smith's mental impairments, wherein she checked boxes indicating that Smith exhibited the following symptoms, among others: blunt, flat, or

---

[1] This letter was apparently prepared at Smith's request. A January 3, 2011 treatment note prepared by Dr. FauntLeRoy states that Smith "wants [a] letter stating she can't work for a year," and that Smith told Dr. FauntLeRoy that she "can't look after [her daughter] and go back to work." (AR 597; *see* AR 19 (ALJ noting record).)

[2] As the ALJ pointed out, these "stressors" included: "full-time work, being a mother . . . , visitation and child support issues with her ex-husband and his new girlfriend[,] a new relationship with an alcoholic boyfriend[,] and her own abuse of alcohol." (AR 19.)

[3] A few days after Dr. FauntLeRoy submitted this letter, she recorded in a treatment note that Smith was "[a]ngry that [the] letter does not say she is totally disabled," and that Smith "[w]ant[ed] a 'total disability' pass from [the Doctor's office] in exchange for very little information about what is really going on inside [her]." (AR 596; *see* AR 18 (ALJ noting record).)

inappropriate affect; impairment in impulse control; mood disturbance; pathological dependence; substance dependence; perceptual or thinking disturbances; intense and unstable interpersonal relationships; and sleep disturbance.  (AR 618.)  The Doctor noted that Smith's mood and temper control were better when she was on medication but that the benefit from medication was "limit[]ed."  (AR 617.)  Dr. FauntLeRoy further opined that Smith had moderate limitations in performing activities of daily living; marked difficulties in maintaining social functioning; and extreme difficulties in maintaining concentration, persistence, or pace.  (AR 619.)  Moreover, the Doctor opined that Smith demonstrated a substantial loss of ability to maintain regular attendance and be punctual, work with others, complete a normal workday and workweek, and respond appropriately to changes or stress in a normal work setting.  (AR 620.)  Dr. FauntLeRoy further opined that Smith was seriously limited in her ability to maintain attention for two-hour segments, sustain an ordinary routine, make simple work-related decisions, ask simple questions, and maintain socially appropriate behavior.  (AR 620–21.)  The Doctor concluded that Smith would miss more than four days of work per month as a result of her mental impairments (AR 621), and that Smith's prognosis was "fair with abstinence [from alcohol]; poor without it" (AR 617).

On January 24, 2012, Dr. FauntLeRoy stated in a letter to Smith's attorney that she could no longer evaluate or make recommendations about Smith "until she has had a significant period of abstinence [from alcohol]."  (AR 679.)  The Doctor explained that she had not seen Smith "in a 'clean' state" and therefore "c[ould] not say whether or not [Smith's] substance abuse ha[d] a relationship to her limitations."  (*Id.*)

About a year later, in February 2013, Dr. FauntLeRoy and treating therapist Michael Dorr, M.S. (who had treated Smith since June 2008), completed a second Treating Source Statement regarding Smith's mental impairments, wherein they concluded that, "[d]espite [Smith's] ability to abstain from alcohol since Jan[uary] 2012, her mood lability and difficulties with focus and memory remain a serious impediment to her success in full[-]time employment." (AR 729.) Dr. FauntLeRoy and Dorr stated that Smith's prognosis was "[p]oor to fair" (AR 724), and checked boxes indicating that Smith exhibited symptoms of decreased energy, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional lability, easy distractibility, and sleep disturbance, among others (AR 725). In addition, Dr. FauntLeRoy and Dorr opined that Smith's mental ability to function was seriously limited in several areas, including maintaining attention, interacting with the public, and responding to work pressures and stress; and that Smith would miss more than four days of work per month due to her mental impairments. (AR 726–28.)

In contrast to these opinions of Dr. FauntLeRoy (and therapist Dorr), in November 2010 and February 2011, nonexamining agency consultants Dr. Patalano and Dr. Schwarzreich each opined that, although Smith was limited in her ability to handle high-stress tasks due to low frustration tolerance and may have occasional problems with concentration and persistence due to occasional increases in anxiety/depression associated with environmental stressors, she could understand and perform two- to three-step instructions; sustain concentration, persistence, and pace for two-hour periods in an eight-hour workday; and manage routine change in a low-stress environment. (AR 81–85,

108–09.)  Dr. Patalano and Dr. Schwarzreich further opined that, although Smith had

"extremely immature interpersonal skills and is emotionally reactive with a short fuse,"

she was capable of "routine collaborating with supervisor[s] and limited interaction with

coworkers."  (AR 82, 109.)

The ALJ afforded "great weight" to the agency consultant opinions and only "some

weight" to Dr. FauntLeRoy's opinions.  (AR 21; *see also* AR 20 (stating that

Dr. FauntLeRoy's opinions are "not given great weight").)  The ALJ was required to

analyze the opinions of Dr. FauntLeRoy under the "treating physician rule," given that she

was Smith's treating psychiatrist during the alleged disability period.  Under that rule, a

treating source's opinions on the nature and severity of a claimant's condition are entitled

to "controlling weight" if they are "well[]supported by medically acceptable clinical and

laboratory diagnostic techniques and [are] not inconsistent with the other substantial

evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563,

567–69 (2d Cir. 1993).  The deference given to a treating source's opinions may be

reduced, however, in consideration of other factors, including the length and nature of the

treating source's relationship with the claimant, the extent to which the medical evidence

supports the treating source's opinions, whether the treating source is a specialist, the

consistency of the treating source's opinions with the rest of the medical record, and any

other factors "which tend to . . . contradict the opinion[s]."  20 C.F.R. § 404.1527(c)(2)–

(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  If the ALJ gives less than

controlling weight to a treating source's opinions, he must provide "good reasons" in

support of that decision.  *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

Smith claims that the ALJ failed to consider the above-described regulatory factors in determining what weight to assign to Dr. FauntLeRoy's opinions.  (Doc. 6 at 8–12.) According to Smith, "there is no indication how the ALJ weighed Dr. FauntLeRoy's opinion[s]," and "nothing in the [ALJ's] decision . . . indicate[s] that ALJ Merrill considered the required factors in determining the weight to give [them]."  (*Id.* at 8.) Specifically, Smith asserts that the ALJ should have considered the length of her treating relationship with Dr. FauntLeRoy, who, as noted above, began treating Smith in November 2005; and that Dr. FauntLeRoy specialized in psychiatry, which was the particular area of specialty most relevant to Smith's disability claim.  (*Id.*)  The ALJ's decision clearly indicates, however, that the ALJ was aware of both Dr. FauntLeRoy's extensive and lengthy treatment relationship with Smith and Dr. FauntLeRoy's specialty in psychiatry: the decision describes Dr. FauntLeRoy's treatment notes and medical opinions from the relevant period in detail.[4]  (*See* AR 18–21.)  Moreover, the ALJ properly considered other relevant factors in assessing the weight of Dr. FauntLeRoy's opinions, namely, their consistency and supportability with the record.  (*Id.*)  Of particular import, the ALJ accurately stated that all but the most recent (February 2013) of Dr. FauntLeRoy's opinions were "rendered . . . when [Smith] was abusing alcohol."  (AR 20.)  The ALJ stated:

> [Dr. FauntLeRoy] rendered these opinions when [Smith] was abusing alcohol.  In fact, both Mr. Doffs and Dr. Faunt[L]e[R]oy later expressed great concern about [Smith's] binge drinking habit. . . .  Dr. Faunt[L]e[R]oy later

---

[4]  The decision also notes that Dr. FauntLeRoy "is identified as [Smith's] primary treating provider," thereby acknowledging the treatment relationship.  (AR 21.)

> questioned [Smith's] diagnosis; noting that . . . a major confounding factor
> was her binge drinking[, which] . . . was overtaking her other problems and
> making them impossible to treat rationally.

(*Id.* (citations omitted) (citing AR 677–78).)

Regarding the more recent February 2013 opinions of Dr. FauntLeRoy, which were

made after Smith achieved sobriety, the ALJ found that they were inconsistent with the

record, particularly Dr. FauntLeRoy and Dorr's own treatment notes (AR 21), which the

ALJ accurately described as follows:

> Recent records of Dr. Faunt[L]e[R]oy reflect that [Smith] is sober from
> alcohol and that her mood has improved with sobriety.  Her treatment records
> in September 2013 show that [Smith's] current condition was "very much
> improved" since she started treatment, that she was sober, and doing well
> with problem[-]solving and less reactivity.  Her recent mental status exams
> are mostly normal, with cooperative behavior, normal speech, appropriate
> dress and grooming[,] and goal[-]directed thought process.  December 2013
> counseling notes show that [Smith] continued to be doing very well, with
> stable mood, and managing her stressors effectively.

(AR 20 (citations omitted) (citing AR 798, 803, 817).)  Smith asserts that the ALJ should

not have presumed that, because Smith "improved considerably," she was in "remission."

(Doc. 6 at 10.)  But it was proper for the ALJ to consider treatment notes stating that

Smith's mental condition improved after she achieved sobriety.  (*See, e.g.*, AR 748–49,

754–55, 788–89, 801–02, 815–18.)  And the decision does not indicate that the ALJ

presumed from these treatment notes that Smith was fully recovered; rather, he found that

they were not consistent with Dr. FauntLeRoy's opinions regarding the severity of Smith's

mental limitations.  This finding is supported by substantial evidence.

For example, a March 14, 2013 treatment note from therapist Dorr states that,

although Smith was still having difficulty with chronic fatigue (which she believed was

related to her medications), her condition was "very much improved since the initiation of treatment," and she was "handling current stressors very well" and "[s]etting excellent boundaries with others." (AR 748.)  Because of Smith's improvement, Dorr decided–with Smith's agreement–that they would reduce therapy sessions to every other week. (*Id.*)  In a treatment note from a few months later, on August 15, Dorr again stated that Smith's condition had "very much improved"; and that Smith was "experiencing significant improvement in her mood state and motivation"; and was "very engaged and focused" during the session. (AR 788.)  The note detailed an incident that had occurred several days earlier, at a time when Smith's boyfriend was out of state, leaving Smith alone in the home to care for her daughter and her boyfriend's daughter, and Smith "decided to take the 4-wheel out back on their large property" to look at wildlife, but she ended up having to walk a long way to get home. (*Id.*)  Dorr stated that he "praised [Smith] for working through her anxiety [i]n this incident successfully." (*Id.*)  In treatment notes dated September 19, 2013 and November 21, 2013, respectively, Dorr again stated that Smith was "doing well overall" and "doing well generally." (AR 801, 815.)  In the November note, Dorr stated that Smith was "relaxed and engaged" at the session, that her mood had been "relatively stable," and that she was "getting ready for the holidays." (AR 815.)  In a December 12, 2013 treatment note, Dorr again recognized Smith's improvement, and stated that she was "engaged and talkative" at the session, and "generally doing well," with "stable" moods. (AR 817.)  Considering these and other medical records, the ALJ reasonably determined that, despite her mental impairments, Smith was not as limited as Dr. FauntLeRoy opined.

In addition to considering the medical evidence in assessing the value of Dr. FauntLeRoy's opinions, the ALJ also considered that Smith engaged in a "wide range of activities that are inconsistent with the full extent of her allegations," including: working part-time as a hairstylist at a salon, attending a hairdressers' convention in Boston, running errands, cleaning a house (not her own), helping to host a birthday party for many 13-year olds, going to the gym daily, and scrapbooking.  (AR 20–21; *see* AR 574 ("[l]ots of stuff to do – errands, sister around, the gym[,] scrapbooking"), 575 ("[g]oes to gym everyday[,] [c]leans up [boyfriend's] house[,] [d]oing stuff [with] sister"), 643 (attended weekend hairdressers' convention), 653 (doing well at work), 678 ("working regularly"), 731 (planning for "very stressful" birthday party with 18 teenagers), 772 (work going "ok").) The ALJ also considered that Smith "has relationships" with family and friends, and concluded that, although Smith is impaired in her ability to function socially, she "is able to have relationships and interact appropriately on a limited basis."  (AR 21; *see generally* AR 19–21 (ALJ noting Smith's long-term relationship with a boyfriend and relationships with her adolescent daughter and boyfriend's adolescent daughter), 643 (had fun with friends at hairdressers' convention), 647 (discussing visit from a friend), 651 (describing conversation about dating with a friend), 765 (spending time with friends).)  Substantial evidence supports these findings.  Furthermore, as discussed above, the ALJ explicitly considered at least two significant regulatory factors—consistency and supportability—in assessing the value of Dr. FauntLeRoy's opinions.  Smith asserts that the ALJ did not explicitly consider other applicable regulatory factors (*see* Doc. 6 at 8), but there is no requirement that ALJs give multiple reasons in support of their analysis of a treating

physician's opinions, and the Second Circuit does not require "slavish recitation of each and every [regulatory] factor where the ALJ's reasoning and adherence to the regulation[s] are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31–32).

Smith also claims that the ALJ erred in his analysis of the opinions of nonexamining agency consultants Dr. Patalano and Dr. Schwartzreich, pointing out that they were made before Dr. FauntLeRoy prepared her two Treating Source Statements. (Doc. 6 at 14–15.)  The regulations permit the opinions of nonexamining agency consultants like Drs. Patalano and Schwartzreich to override those of treating physicians, when the former are more consistent with and supported by the evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler*, 3 F.3d at 567–68); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the ALJ explained that he gave great weight to the agency consultant opinions because they are "supported . . . with references to the objective medical record, which reflects at most moderate symptoms due to bipolar disorder."  (AR 21.)

Acknowledging that Drs. Patalano and Schwarzreich had not reviewed Dr. FauntLeRoy's opinions and other medical evidence before making their opinions, the ALJ stated: "Although additional evidence was received after [the consultant opinions were made], this evidence does not present a material change in [Smith's] condition[,] and [the consultant opinions] remain[] consistent with the evidence of record in its totality."

(*Id.*)  These findings are supported by substantial evidence, as discussed above.  Moreover, they are supported by Second Circuit case law.  In *Camille v. Colvin*, the Second Circuit recently reiterated that "[n]o case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record," when the additional evidence raises no doubts as to the reliability of that opinion.  652 F. App'x 25, 28, n.4 (2d Cir. 2016); *see Charbonneau v. Astrue*, Civil Action No. 2:11–CV–9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012) (holding that, where agency consultant opinions are supported by the record and there is no evidence of a new diagnosis or a worsening of the claimant's condition after the consultant opinions were made, the ALJ may rely on them).  The more recent treatment records and opinions of Dr. FauntLeRoy and therapist Dorr do not demonstrate that Smith's condition materially worsened after the agency consultants made their opinions in 2010 and 2011, respectively.  Rather, as discussed above, later treatment notes indicate that Smith's mental condition improved beginning in 2012, when she discontinued alcohol use.

For these reasons, the Court finds that the ALJ did not err in assigning only "some weight" to Dr. FauntLeRoy's opinions and "great weight" to the opinions of the nonexamining agency consultants; and that this assessment of the medical opinions is supported by substantial evidence.

## II.   Smith's Ability to Handle Stress

Next, Smith argues that the ALJ's errors regarding his analysis of the medical opinions resulted in a "deficient" RFC determination.  (Doc. 6 at 14.)  Specifically, Smith claims the ALJ did not adequately account for her limited ability to handle stress, citing

Dr. FauntLeRoy's identification of Smith's workplace stressors and the opinions of

Drs. Patalano and Schwartzreich that workplace stress would affect Smith's ability to

function.  (*Id.* at 13 (citing AR 85, 96).)  As noted above, however, Dr. FauntLeRoy's

opinions were entitled to only some weight, given their inconsistency with the record.

Moreover, Drs. Patalano and Schwartzreich did not opine that *any* amount of stress would

limit Smith's ability to function; they stated that Smith was limited from performing

"complex, *high*[-]stress tasks."  (AR 84, 108 (emphasis added).)  Dr. Patalano added that

Smith could "manage routine change in a low[-]stress work environment" (AR 85), and

Dr. Schwartzreich stated that Smith "[s]hould avoid *undue* work changes and stressors"

(AR 109 (emphasis added)).  Stating that a claimant is unable to handle high-stress tasks at

work is not the same as stating that a claimant is unable to handle any stress at all at work.

Smith cites to Social Security Ruling (SSR) 85-15 in support of her claim that the

ALJ did not account for her stress limitations in his RFC determination.  That SSR states:

"The mentally impaired may cease to function effectively when facing such demands as

getting to work regularly, having their performance supervised, and remaining in the

workplace for a full day. . . .  Thus, the mentally impaired may have difficulty meeting the

requirements of even so-called 'low-stress' jobs."  1985 WL 56857, at *6 (1985).  But of

course, each case is taken on its own merits, *id.* at *5 ("Determining whether [mentally

impaired] individuals will be able to adapt to the demands or 'stress' of the workplace is

often extremely difficult" and requires a thorough "evaluation on an individualized

basis."), and here, the evidence indicates that Smith was able to handle a limited amount of

stress (*see, e.g.*, AR 643 (attending hairdressers' convention in Boston), 678 ("working

18

regularly"), 732 (helping host a "crowded teen [birth]day party" in her home), 788 (caring

for her adolescent daughter and her boyfriend's adolescent daughter on her own while

boyfriend out of state), *id.* (going four-wheeling on her own)).  Furthermore, SSR 85-15

recommends that ALJs obtain the opinion of a VE to determine the effect that a claimant's

limited ability to handle stress has on the occupational base, SSR 85-15, 1985 WL 56857,

at *3, and the ALJ did so here, *see* AR 36–38.  Specifically, the ALJ asked the VE at the

May 2014 administrative hearing if any of Smith's past work had been "high stress," as

defined in the DOT, and the VE testified that it had not.  (AR 36.)

       Accordingly, the Court finds that the ALJ adequately accounted for Smith's ability

to handle stress in his RFC determination.  *See Cichocki v. Astrue*, 729 F.3d 172, 177

(2d Cir. 2013) (collecting cases) (holding that an ALJ's RFC assessment need only

"afford[] an adequate basis for meaningful judicial review, appl[y] the proper legal

standards, and [be] supported by substantial evidence such that additional analysis would

be unnecessary or superfluous").

## III.    Vocational Expert Testimony

       Finally, Smith argues that the ALJ erred at step five in finding that the VE's

testimony at the administrative hearing was "consistent with the information contained in

the Dictionary of Occupational Titles [(DOT)]" (AR 24), without questioning the VE

about this issue at the hearing or "otherwise ascertain[ing][] whether or not the VE's

testimony was consistent with the DOT/SCO."  (Doc. 6 at 15.)  In support of this

argument, Smith cites SSR 00-4p, which requires that, if there is an "apparent unresolved

conflict" between the VE's testimony and the DOT, the ALJ must inquire further and

obtain a "reasonable explanation" for the conflict.  SSR 00-4p, 2000 WL 1898704, at *2

(Dec. 4, 2000); *see Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008).  Under this

SSR, a "conflict" exists between the testimony of a VE and the DOT when the two

disagree in categorizing and describing the requirements of the job as performed in the

national economy.  *See Jasinski v. Barnhart*, 341 F.3d 182, 184–85 (2d Cir. 2003).  "Many

specific jobs differ from those jobs as they are generally performed [and thus as they are

described in the DOT], and the [VE] may identify those unique aspects without

contradicting the [DOT]."  *Id.* at 185; *see Schmitt v. Astrue*, No. 5:11-CV-0796

(LEK/ATB), 2012 WL 4853067, at *3 (N.D.N.Y. Oct. 11, 2012) ("[T]he DOT need not

mention every characteristic of claimants' limitations, as it is 'not comprehensive, but

provides only occupational information on jobs as they have been found to occur, but they

may not coincide in every respect with the content of jobs as performed in particular

establishments or at certain localities.'" (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1435

(9th Cir. 1995)).  Here, Smith has not identified a conflict between the VE's testimony and

the DOT.  Therefore, the ALJ's failure to inquire as to any possible conflicts between the

VE's testimony and the DOT constituted at most harmless error.  *See Martin v. Comm'r of

Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30,

2008) ("Perceiving no conflict between the DOT and the [VE's] testimony regarding

available work," the court rejected plaintiff's argument that there was an inconsistency.);

*Cordray v. Astrue*, Civil No. 08-1386-JE, 2010 WL 2608331, at *9 (D. Or. Mar. 3, 2010)

(if "there is no conflict between the VE's testimony and the DOT, or if the VE provides

sufficient support for her conclusions to justify any potential conflicts," the ALJ's failure

to ask the VE whether her testimony is consistent with the DOT is "at most harmless error" (internal quotation marks omitted)), *report and recommendation adopted*, No. 08-CV-1386-JE, 2010 WL 2608336 (D. Or. June 23, 2010).

The Court rejects Smith's suggestion that the ALJ was bound by the VE's testimony that no jobs would exist for a hypothetical claimant possessing the same mental limitations as Smith.  (*See* Doc. 6 at 12–14; Doc. 8 at 5–6; *see also* AR 52–53.)  The Second Circuit has held: "An ALJ may rely on a [VE's] testimony regarding a hypothetical *as long as* the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved."  *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (emphasis added) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).  Conversely, if "substantial record evidence" does not support "the assumption upon which the [VE] based his opinion," the ALJ need not rely on that opinion.  *Dumas*, 712 F.2d at 1554.  The Second Circuit explained: "The [VE's] testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job."  *Aubeuf*, 649 F.2d at 114.  Applied here, the VE's testimony in response to the hypotheticals presented by Smith's counsel at the administrative hearing (*see* AR 52–53), was only useful if the proposed hypothetical claimant(s) shared the same mental limitations and capabilities as Smith.  As explained above, however, the ALJ reasonably found that Smith's claims regarding the severity of her impairments, and the supporting opinions of Dr. FauntLeRoy, are unsupported by and

21

inconsistent with the record.  Therefore, the ALJ properly declined to adopt the VE's testimony in response to the hypotheticals presented by Smith's attorney.

**Conclusion**

For these reasons, the Court DENIES Smith's motion (Doc. 6), GRANTS the Commissioner's motion (Doc. 7), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 23rd day of January, 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge